E. E. DICKINSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5193. Promulgated October 10, 1927.

1. A yacht purchased by the petitioner held to be a business asset, and the costs of operation to be deductible as ordinary and necessary business expenses.

2. Rates of depreciation on a yacht determined.

*Barry Mohun, Esq.*, for the petitioner.
*A. H. Murray, Esq.*, for the respondent.

This proceeding is for the redetermination of deficiencies in income taxes for the fiscal years ended September 30, 1918, and September 30, 1920, in the amounts of $3,180.90 and $2,885.77, respectively. The proceeding results from the disallowance of depreciation deductions on a yacht for each fiscal year, and the disallowance of a deduction for operating expenses of the yacht for the fiscal year 1920.

FINDINGS OF FACT.

The petitioner resides in Essex, Conn., on the Connecticut River, six miles north of Long Island Sound. Essex is a small country town of approximately 3,000 inhabitants located in the center of a natural circle of witch hazel brush from which witch hazel is extracted. Dickinson has been engaged in the production of witch hazel for over 40 years, operating as an individual until 1921.

The production of witch hazel is a highly competitive business as the producer is unprotected by patents, secret processes, or formulae. Petitioner has carefully supervised the manufacture of his product, installing special distilling equipment which has enabled him to receive 5 cents more per gallon on his product than competitors were able to receive. Buyers were encouraged to visit and inspect the plant and its equipment. The lack of amusement facil-

ities in Essex made it necessary for petitioner to provide some incentive for such a visit. Prior to 1916 a small sail boat operated for pleasure purposes by petitioner's son had been used to great advantage. In 1916 after consulting with his son, petitioner ordered a yacht to be used for entertaining customers and prospects.

The yacht, known as the *Nautilus II*, ordered late in 1916, was completed in 1917 at a cost of $18,904.75. The yacht when completed was of the fast cruiser type, 66 feet in length, and constructed for inland water operations. Its power plant consisted of 2 six-cylinder, high speed gasoline engines designed to make 18 knots. The saloon was mahogany trimmed with plate glass windows and doors. There were cabinets, lockers and shelves for books, advertisements and literature relative to witch hazel, and cupboards for samples of witch hazel.

Before the yacht was completed the Government leased it from petitioner for a nominal rental of $1 per month for such period as the Secretary of the Navy should desire to retain it in Government service. The contract dated June 7, 1917, provided that the Government should reimburse the petitioner in a sum which would restore the vessel to the condition at the date of procurement, ordinary wear and tear excepted. The contract also provided for reimbursement and indemnification for loss of use and depreciation. The yacht went into Government service immediately upon completion by the builders and acceptance by the purchaser.

Upon receipt of the vessel the Government stripped it of awnings and various fixtures. The plate-glass windows and doors were removed. Small round port lights and heavy frame work were installed because of the danger of concussion of a 3-pound gun placed on the forward deck. Additional heavy frame work was installed below the dining saloon floor to support the gun. The glass doors on the side of the saloon and the mahogany cabinets and fixtures were torn out to provide ammunition, locker and berth space. A heavy rough pilot house was erected on the bridge deck in the center of the boat. The after deck was removed to install additional tankage and coal-bin facilities. The after quarters containing the wash room, bathtub, and the like, were torn out and additional sleeping quarters and a heating plant installed.

The petitioner's son was made an ensign and from June, 1917, until August 15, 1918, was in command of the yacht. After that date he was assigned to the Naval overseas transportation service and had under his command as lieutenant, junior grade, his father's boat and six others. The yacht when released by the Government on February 14, 1919, had to be towed to the shipyard by a tug, as it was unable to move under its own power and was badly wrecked.

The value of the boat when returned by the Government was approximately $5,000.

While in Government service the boat was operated continuously except when laid up for repairs. It operated day and night in all kinds of weather. The rudder was snapped off the first night of Government duty during a storm, and in December, 1917, the stern was stove in. Boarding duty required the yacht to lie alongside large steel vessels in rough weather, which subjected it to severe strains. The ice in New York harbor during the winter of 1917–1918 subjected the machinery to exceptional strains and constantly endangered the lives of the crew. The yacht was originally designed for use during the yachting season from May to October, or early November, and with the average use thereof made by a private owner, it would have cruised approximately 2,000 miles per season. The Government ran the boat 25 to 50 or 100 miles per day. The average life of a private yacht under ordinary conditions is 20 years. The remaining life of the petitioner's yacht after being reconditioned was 10 years. The cost of reconditioning was $11,518.41. The amount paid by the Government under its contract to reimburse and indemnify petitioner was $4,626. The yacht after being reconditioned was returned to petitioner in June, 1919.

During the summer of 1920 the yacht was used in petitioner's business to entertain customers during the week ends. The petitioner and his salesmen carried photographs of the yacht and promised trips on the yacht if a customer would visit the plant. If the customer agreed to visit Essex a definite engagement for a week-end trip was made. Customers were entertained practically every week end during the 1920 season. The boat was only used occasionally during the week, and then primarily for entertaining customers. Once a year the office employees were taken for a moonlight sail, and the mill and warehouse employees were taken on another evening. Friends or relatives of petitioner, or his family, were not entertained on the yacht. The petitioner was accompanied by his wife only when the customer's wife came down. On one or two occasions during the 1920 season, customers were unable to keep their engagements. In such cases petitioner made use of the yacht as it was already provisioned with supplies which were partly perishable. The petitioner's superintendent was substituted on one trip when the customer failed him. Petitioner was not a yachtsman nor was he a member of any yacht club. The operating expenses of the yacht for 1920 were $8,627.32.

The petitioner was allowed a 50 per cent depreciation deduction on the original cost for the fiscal year 1917, and for 1918 he took a

deduction of 25 per cent of original cost or $4,726.18. A depreciation deduction is claimed for the fiscal year 1920 of $2,321.75, and in addition thereto, a deduction of $8,627.32 as ordinary and necessary business expenses. The respondent disallowed the deductions, holding that the yacht and the expenses incident thereto were personal expenditures, and therefore not deductible.

OPINION.

MORRIS: The question presented is whether the yacht *Nautilus II* was a business asset upon which depreciation may be taken and the costs of operation may be deducted.

The record convinces us that the yacht was bought and used by petitioner for the purpose of inducing customers and prospective customers to visit petitioner's plant to the end that the sales of his product would be stimulated. The petitioner felt that his process of manufacture surpassed that of his competitors, and that therefore an inspection of his plant was an excellent sale producer. In addition, pamphlets advertising his plant were placed on the yacht for the use of the guests. The yacht was purchased in anticipation that certain benefits would flow to the business, and petitioner testified that the results have more than justified the outlay. Customers were invariably present when the yacht was in use, except on two annual occasions when the employees were entertained, and when for some reason customers were unable to keep their engagement. We are of the opinion that the yacht was a business asset and that the petitioner is entitled to deduct the operating expenses. For the fiscal year 1920 the operating expenses were stipulated to be $8,627.32.

For the fiscal year 1918, depreciation of 25 per cent is claimed on the yacht and in our opinion the evidence supports the rate claimed. The naval architect in charge of reconditioning the yacht testified with respect to its condition in February, 1919, as follows:

We had a difficult proposition. We had a boat there that was badly wrecked, certain essential members of the boat had been damaged, the essential members of strength, and the engine was practically shot, as we say in business, and we restored the boat as far as it was possible, covering up the damage with paint and varnish and made a boat that was presentable, but actually was just a nice trimming on a very battered framework or hull.

He further testified that the value of the boat as of February, 1919, when returned by the Government was approximately $5,000. Allowing 25 per cent depreciation for the fiscal year 1918 as claimed, leaves an undepreciated cost of $4,726.18, which is in close proximity of the value testified to by the architect.

We are unable to agree with the contention that the depreciation deduction for the fiscal year 1920 should be $2,321.75. The recon-

ditioning cost of $11,518.41 less the $4,626 paid by the Government leaves $6,892.41 as the additional cost of the yacht. The latter figure plus the undepreciated original cost of $4,726.18 amounts to $11,618.59, which should be depreciated over the 10-year remaining life of the yacht.

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by TRAMMELL and LITTLETON.